UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>JOAO MENDES, )<br><br>Defendant ) | Criminal No.    22cr10167<br><br>Violation:<br><br><u>Count One</u>: Wire Fraud<br>(18 U.S.C. § 1343)<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)) |

<u>INFORMATION</u>

At all times relevant to this Information:

<u>General Allegations</u>

1.      The defendant, JOAO MENDES ("MENDES"), was a resident of Brockton, Massachusetts, who controlled various companies registered in Massachusetts and elsewhere.

2.      Individuals 1 and 2 were relatives of MENDES who resided in Massachusetts.

3.      MB Records, Inc. ("MB Records") was a Massachusetts company that was registered on or about January 1, 1993, and involuntarily dissolved on or about August 31, 1998. MENDES was listed as the Treasurer of MB Records.

4.      Palonkon Publishing, Inc. ("Palonkon Publishing") was a Massachusetts company that was registered on or about December 14, 2000, and involuntarily dissolved on or about May 31, 2007.  MENDES was listed as the Treasurer of Palonkon Publishing.

5.      Quantum World Enterprises, LLC ("Quantum World") was a Wyoming company that was registered on or about January 25, 2013.

6.      Mendes World Trade, Inc. ("World Trade") was a Massachusetts company that was registered on or about April 9, 1996, and involuntarily dissolved on or about May 31, 2007. MENDES was listed as the treasurer of World Trade.

7.      Maat Holdings, LLC ("Maat") was purportedly a Massachusetts company registered on or about March 1, 2017.  Public records for Massachusetts do not reflect a company registration for Maat.

8.      Lunar Media, LLC ("Lunar") was a company registered in Alaska on or about November 24, 2020.

9.      La Femme Media, LLC ("La Femme Media") was a company registered in Alaska on or about July 29, 2020.

10.     MB Records, Palonkon Publishing, Quantum World, World Trade, Maat, Lunar, and La Femme Media are referred to in this Information collectively as the "MENDES Entities."

11.     The United States Small Business Administration ("SBA") was an agency of the executive branch of the United States government.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.  As part of this effort, the SBA enabled and provided for loans, guaranteed by the government, through banks, credit unions, and other lenders.

12.     BlueVine was a financial technology company based in California.  BlueVine participated in the Paycheck Protection Program ("PPP"), further described below, by, among other things, acting as a service provider between small businesses and certain lenders.  Small

businesses seeking PPP loans could apply through BlueVine.  If a loan application received by BlueVine was approved for funding, a partner lender disbursed the loan funds to the applicant.

13.     Celtic Bank ("Celtic") was a federally insured financial institution based in Utah. Celtic was an SBA Preferred Lender and participated in the PPP as a lender to small businesses.

14.     Cross River Bank ("Cross River") was a federally insured financial institution based in New Jersey.  Cross River was an SBA Preferred Lender and participated in the PPP as a lender to small businesses.

15.     First Home Bank ("First Home") was a federally insured financial institution based in Florida.  First Home was an SBA Preferred Lender and participated in the PPP as a lender to small businesses.

16.     Small Business Bank was a federally insured financial institution based in Kansas. Small Business Bank participated in the PPP as a lender to small businesses.

17.     Fountainhead Commercial Capital ("Fountainhead") was a company based in Florida that engaged in lending to small businesses.  Fountainhead participated in the PPP as a lender to small businesses.

18.     Fundbox, Inc. ("Fundbox") was a financial technology company based in California that engaged in lending to small businesses.  Fundbox participated in the PPP as a lender to small businesses.

19.     Itria Ventures ("Itria") was a company based in New York that engaged in lending to small businesses.  Itria participated in the PPP as a lender to small businesses.

20.     Kabbage, Inc. ("Kabbage") was a financial technology company based in Georgia that engaged in lending to small businesses.  Kabbage participated in the PPP as both a lender to

small businesses and by acting as a service provider between small businesses and certain other lenders. Small businesses could apply through Kabbage for PPP loans. If a loan application received by Kabbage was approved for funding, either Kabbage or a partner lender disbursed the loan funds to the applicant.

The CARES Act

*A. The Paycheck Protection Program*

21.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 that was designed to provide emergency financial assistance to Americans suffering the economic harm as a result of the COVID-19 pandemic. Among other things, the CARES Act provided funding for forgivable loans to small businesses for job retention and certain other expenses through the PPP.

22.    To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was

eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

23.     A business's PPP loan application was received and processed, in the first instance, by a participating financial institution.  If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies, which were guaranteed by the SBA.

24.     PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

B.  *The Economic Injury Disaster Loan Program*

25.     The Economic Injury Disaster Loan Program ("EIDL") was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

26.     The CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

27.     To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, and gross revenues and the cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDL loans for COVID-19 relief, the 12-month period was from January

31, 2019, to January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

28.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor.  If the application was approved, the amount of the loan was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold.  Any funds issued under an EIDL loan were issued directly by the SBA.

29.     EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP loan funds.

<u>The Scheme to Defraud</u>

30.     Beginning in or around June 2020, and continuing until at least in or around September 2020, in the District of Massachusetts and elsewhere, MENDES, together with others known and unknown to the United States, devised and executed a scheme to defraud, and to fraudulently obtain pandemic relief funds, by filing falsified EIDL and PPP loan applications with BlueVine, Celtic, Cross River, First Home, Small Business Bank, Fountainhead, Fundbox, Itria, and Kabbage on behalf of the MENDES Entities.

31.     The purpose of the scheme was for MENDES to obtain EIDL and PPP loan proceeds under false and misleading pretenses and through the submission of fraudulent EIDL and PPP applications.  The applications included false statements about the number of employees, the average monthly expenses associated with payroll for employees, and phony documents and forms.

6

*A.  The "Joao Mendes" Applications*

32.     On or about June 16, 2020, MENDES submitted a false and misleading EIDL application (the "Mendes EIDL Application") to the SBA in the name of a purported "Joao Mendes" sole proprietorship.  MENDES certified that the application and the information provided in all supporting documents and forms was true and accurate.

33.     The Mendes EIDL Application falsely stated that the MENDES sole proprietorship had one employee, $275,000 in gross revenues, and $10,000 in goods sold for the twelve months prior to the COVID-19 pandemic.

34.     Based on the information provided in the Mendes EIDL Application, the SBA approved the EIDL Application for a $1,000 advance.  On or about June 22, 2020, the $1,000 EIDL advance was deposited into a Citibank account ending in 3669 in MENDES's name (the "MENDES Citibank Account").

35.     On or about June 18, 2020, MENDES submitted a false and misleading PPP application to Kabbage as an "eligible self-employed individual" (the "Individual Application"). Mendes signed the Individual Application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

36.     The Individual Application falsely claimed one employee and $8,164 in average monthly payroll.  In addition, MENDES submitted with the Individual Application a purported 2019 IRS Schedule C (Profit or Loss From Business (Sole Proprietorship)) claiming $165,873.23 in gross receipts or sales.

37.     Kabbage approved the Individual Application.  On or about June 22, 2020, PPP loan funds in the amount of $20,408 were deposited into the MENDES Citibank Account.

*B.  The MB Records Applications*

38.     On or about June 16, 2020, MENDES submitted a false and misleading EIDL application in the name of MB Records (the "MB EIDL Application").  MENDES signed the Loan Authorization and Agreement with the SBA and certified that the application and the information provided in all supporting documents and forms was true and accurate.

39.     The MB EIDL Application falsely claimed that MB Records had two employees, $380,000 in gross revenues, and $150,000 in goods sold for the twelve months prior to the COVID-19 pandemic.

40.     The SBA approved the MB EIDL Application.  On or about June 22, 2020, loan funds totaling approximately $114,900 were deposited into MB Records' account at Cambridge Savings Bank.

41.     On or about June 30, 2020, MENDES submitted a false and misleading PPP application to Cross River in the name of MB Records (the "Cross River MB Records Application").  MENDES signed the Cross River MB Records Application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

42.     The Cross River MB Records Application falsely claimed that MB records had nine employees and $69,273 in average monthly payroll, in contrast to the two employees referenced in the MB EIDL Application.  In addition, MENDES submitted with the Cross River MB Records Application a purported 2019 Form 944 (Employer's Annual Federal Tax Return), and a purported 2019 Schedule C claiming $1,740,921.48 in gross receipts or sales.

43.     Cross River approved the Cross River MB Records Application.  On or about July 2, 2020, PPP loan funds in the amount of $173,182.50 were deposited into the MENDES Citibank Account.

### C.  The Palonkon Publishing Applications

44.     On or about June 11, 2020, MENDES submitted a false and misleading PPP application to Small Business Bank in the name of Palonkon Publishing (the "SBB Palonkon Application").  MENDES signed the SBB Palonkon Application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

45.     The SBB Palonkon Application falsely claimed two employees and $98,578.15 in average monthly payroll.  The SBB Palonkon Application was denied.

46.     On or about June 25, 2020, MENDES submitted a false and misleading PPP application to Fountainhead in the name of Palonkon Publishing (the "Fountainhead Palonkon Application").  MENDES signed the Fountainhead Palonkon Application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

47.     The Fountainhead Palonkon Application falsely claimed nine employees and $74,997 in average monthly payroll.  In addition, MENDES submitted with the Fountainhead Palonkon Application falsified IRS tax forms including a 2019 Form 944, a first quarter 2020 Form 941 (Employer's Quarterly Federal Tax Return) claiming eight employees, and a 2019 Schedule C claiming $1,390,967.90 in gross receipts or sales.  The Fountainhead Palonkon Application was denied on July 13, 2020.

48.     On or about July 24, 2020, MENDES submitted a false and misleading PPP application to Kabbage in the name of Palonkon Publishing (the "Kabbage Palonkon Application").   MENDES signed the Kabbage Palonkon Application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

49.     The Kabbage Palonkon Application falsely claimed eight employees and $200,059 in average monthly payroll.   In addition, MENDES submitted with the Kabbage Palonkon Application falsified 2019 IRS tax forms including a Form 940 (Employer's Annual Federal Unemployment Tax Return), a W-3 (Transmittal of Wage and Tax Statements) showing 35 W-2s, and a Schedule C claiming $3,384,758.28 in gross receipts or sales.

50.     Kabbage approved and funded a PPP loan in the amount of $500,146.   On or about July 28, 2020, PPP loan funds were deposited into an account at Bank of America in MENDES's name.

   *D.  The Quantum World Application*

51.     On or about June 16, 2020, MENDES submitted a false and misleading EIDL application to the SBA for Quantum World (the "Quantum EIDL Application").   MENDES signed the Loan Authorization and Agreement with the SBA and certified that the application and the information provided in all supporting documents and forms was true and accurate.

52.     The Quantum EIDL Application falsely claimed that Quantum World had two employees, $535,934 in gross revenues, and $234,589 in cost of goods sold for the twelve months prior to the COVID-19 pandemic.

10

53.     The SBA approved the Quantum EIDL Application.  On or about September 2, 2020, EIDL funds totaling approximately $149,900 were deposited into an account at Santander Bank in the name of Quantum World.

E.  *The World Trade Applications*

54.     On or about June 22, 2020, MENDES submitted a false and misleading PPP application to Itria in the name of World Trade ("Itria World Trade Application").  MENDES signed the application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

55.     The Itria World Trade Application falsely stated that World Trade had ten employees and $975,426 in average monthly payroll.  In addition, MENDES submitted with the Itria World Trade Application purported IRS tax forms, including a 2019 Form 940 and Forms 941 for three quarters of 2019 and one quarter of 2020.  The Itria World Trade Application was not funded.

56.     On or about June 23, 2020, MENDES submitted a false and misleading EIDL application to the SBA in the name of World Trade (the "World Trade EIDL Application").  MENDES certified that the application and the information provided in all supporting documents and forms was true and accurate.

57.     The World Trade EIDL Application falsely claimed that World Trade had ten employees, $3,200,000 in gross revenues, and $2,000,000 in cost of goods sold for the twelve months prior to the COVID-19 pandemic.  The SBA denied the World Trade EIDL Application on or about June 23, 2020.

58.     On or about June 25, 2020, MENDES submitted a false and misleading PPP application to Fundbox in the name of World Trade (the "Fundbox World Trade Application"). MENDES signed the application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

59.     The Fundbox World Trade Application falsely claimed ten employees and $58,828 in average monthly payroll.  In addition, MENDES submitted with the Fundbox World Trade Application purported 2019 IRS tax forms including a Form 944 and a Schedule C claiming $1,332,691.45 in gross receipts or sales.

60.     Fundbox approved the Fundbox World Trade Application.  On or about June 29, 2020, PPP loan funds in the amount of $167,905 were deposited into the MENDES Citibank Account.

   *F.  The Maat Application*

61.      On or about July 21, 2020, MENDES submitted a false and misleading PPP application to Kabbage in the name of Maat Holdings (the "Kabbage Maat Application"). MENDES signed the application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

62.     The Kabbage Maat Application falsely claimed eleven employees and $79,107 in average monthly payroll.  In addition, MENDES submitted with the Kabbage Maat Application purported 2019 tax forms including a Form 940, a Form 944, a W-3, and a Schedule C claiming $1,529,500.48 in gross receipts or sales.

12

63.     Kabbage approved the Kabbage Maat Application.  On or about July 23, 2020, PPP funds in the amount of $197,766 were deposited into an account at Bank of America in MENDES's name.

*G.  The Individual 1 Applications*

64.     On or about June 25, 2020, MENDES caused the submission of a false and misleading PPP application to BlueVine in the name of an "Individual 1" sole proprietorship, seeking a PPP loan in the amount of $20,833, which BlueVine then processed on behalf of Celtic (the "Celtic Individual Application").  The Celtic Individual Application listed Individual 1's Social Security number as the business tax identification number.  The Celtic Individual Application falsely claimed one employee and $8,333.20 in average monthly payroll.  In support of the Celtic Individual Application, MENDES caused the submission of a falsified 2019 IRS Schedule C showing $140,350.25 in gross receipts or sales.

65.      The Celtic Individual Application was approved.  On or about June 26, 2020, PPP loan funds in the amount of $20,833 were deposited into an account at Bank of America in Individual 1's name.

66.     On or about August 10, 2020, MENDES caused the submission of a false and misleading PPP application to Kabbage in the name of Lunar Media (the "Kabbage Lunar Media Application") seeking a PPP loan in the amount of $22,419.  The Kabbage Lunar Media Application falsely claimed two employees and $8,968 in average monthly payroll.  In support of the Kabbage Lunar Media Application, MENDES caused the submission of Individual 1's driver's license and a falsified W-3 tax form for Lunar Media showing two W-2s of $98,645.67 in wages, tips, and other compensation.

13

67.     Kabbage approved the Kabbage Lunar Media Application.  On or about August 12, 2020, PPP loan funds in the amount of $20,419 were deposited into an account at Bank of America in Individual 1's name.

    *H.  The Individual 2 Application*

68.     On or about June 25, 2020, MENDES caused the submission of a false and misleading PPP application to First Home in the name of "Le Femme Media" (the "First Home Le Femme Application") seeking a PPP loan in the amount of $177,756.  Individual 2 signed the application and certified that the application and the information provided in all supporting documents and forms was true and accurate.

69.     The First Home Le Femme Application falsely claimed seven employees and $61,912 in average monthly payroll.  In support of the First Home Le Femme Application, MENDES caused the submission of Individual 2's United States passport, a falsified 2019 payroll report for eight employees, including Individual 2, and a falsified 2019 IRS tax forms including Form 940, Form 941 for all four quarters, Form 944, and a Schedule C showing $990,561.67 in gross receipts or sales.

70.     First Home approved the First Home Le Femme Application.  On or about July 17, 2020, PPP loan funds in the amount of $174,100 were deposited into an account at Bank of America in Individual 2's name.

    *I.  The Use of the Fraudulently Obtained Proceeds*

71.     After the PPP and EIDL loan proceeds were deposited into the above-referenced accounts, MENDES either spent the funds for his own personal benefit—including for the

purchase of cryptocurrency for personal use and investment—or transferred the funds into other accounts controlled by MENDES, Individual 1, and Individual 2.

COUNT ONE
Wire Fraud
(18 U.S.C. § 1343)

The United States Attorney charges:

72.     The United States Attorney re-alleges and incorporates by reference Paragraphs 1-71 of this Information.

73.     From in or around June 2020 through in or around September 2020, in the District of Massachusetts and elsewhere, the defendant,

JOAO MENDES,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | July 24, 2020 | Kabbage PPP Loan Application electronically submitted by Joao Mendes, in Massachusetts, and routed interstate through Kabbage's servers in Virginia. |

All in violation of Title 18, United State Code, Section 1343.

16

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The United States Attorney further alleges:

74.     Upon conviction of wire fraud in violation of Title 18, United States Code, Section

1343, as set forth in Count One of this Information, the defendant,

JOAO MENDES,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the violation of Title 18, United States Code,

Section 1343.  The property to be forfeited includes, but is not limited to, the following assets:

a.  $1,542,759.50, to be entered in the form of an Order of Forfeiture (Money Judgment), representing the total amount of proceeds derived from Defendant's violation of 18 U.S.C. § 1343; and

b.  the following directly forfeitable assets, which constitute or were derived from proceeds traceable to Defendant's violation of 18 U.S.C. § 1343:

1)  $103.45, seized on or about February 24, 2021, from Bank of America account x2292 in the name of Quantum World Enterprises LLC;

2)  $21,384.02 seized on or about February 24, 2021, from the Interactive Brokers account x9180 in the name of Quantum World Enterprises LLC;

3)  $5,000, seized on or about February 24, 2021, from Goldman Sachs account x8818 in the name of Joao Mendes;

4)  $900, seized on or about February 24, 2021, from the Cambridge Savings Bank account x9762 in the name of MB Records Inc.;

5)  $7,678.31, seized on or about February 24, 2021, from Bank of America account x9714 in the name of Joao R Mendes;

6)  $188.66, seized on or about February 24, 2021, from Bank of America account x4402 in the name of Joao R Mendes;

7) $97.38, seized on or about February 24, 2021, from Bank of America account x6132 in the name of Joao R Mendes;

8) $175.07, seized on or about February 24, 2021, from Bank of America account x6145 in the name of Joao R Mendes;

9) $192, seized on or about February 24, 2021, from Eastern Bank account x3770 in the name of Joao R Mendes and another;

10) $2,630, seized on or about February 24, 2021, from Eastern Bank account x5446 in the name of Joao R Mendes and another;

11) $18,000, seized on or about February 24, 2021, from Capital One N.A. account x6816 in the name of Joao R Mendes and another;

12) Any and all funds, seized on or about February 24, 2021, from the Kraken account ending in O7IQ, held in the name Joao Mendes, including, but not limited to:

    i. 0.04664905 BTC;
    ii. 103.58945230 ETH;
    iii. 209656.81881100 ADA;
    iv. 9996.00000000 BAT;
    v. 9994.00000000 STORJ;
    vi. 228.23041000 SNX
    vii. 30.10681000 AAVE;
    viii. 33754.82120000 MANA;
    ix. 5149.11732700 XTZ;
    x. 2081.65634000 ATOM;
    xi. 22515.90792147 DOT; and
    xii. 17.1148276 KSM;

13) All funds except 11.630653 LINK & 11.290393 LINK, seized on or about February 24, 2021, from the Gemini Trust Company account ending in 7384, held in the name Joao Mendes, including but not limited to:

    i. 30.19002081 CRV;
    ii. 0.09745841 AAVE;
    iii. 1.68059207 ETH;
    iv. 3.4527146 LTC; and
    v. $157.77;

14) $183.90, seized on or about February 24, 2021, from Eastern Bank account x7458 held in the name Dominique M Mendes;

15) $14,774.91, seized on or about February 24, 2021, from Eastern Bank account x6242 held in the name Dominique M Mendes;

16) $2,682.74, seized on or about February 24, 2021, from the Bank of America account x2990 in the name of Evamarie S Joubert;

17) $57,962.68, seized on or about February 24, 2021, from the Bank of America account x6489 held in the name of La Femme Media LLC;

18) $29,847.30, seized on or about February 24, 2021, from the Bank of America account x9453 in the name of Evamarie S. Joubert;

19) $26,469.39, seized on or about February 24, 2021, from Interactive Brokers account x2737, held in the name of La Femme Media LLC;

20) Any and all funds, seized or about February 24, 2021, in the BAM Trading Services Inc. ("Binance.US") account with User ID ending in 6593, and held in the name of Joao R Mendes, including but not limited to:

     i.     009831 BTC;
     ii.    11108.4426 VTHO;
    iii.   15.827673 XTZ;
    iv.   107,550.242 VET;
     v.    1,078.8194 ATOM;
    vi.   1087.07504 ALGO;
   vii.   30.658 WAVES;
  viii.   81.30000000 USDT;
    ix.   .16641 ETH; and
     x.    61452.005 ADA;

21) All funds, except $8,750, 448.5776 XRP, 873.0526 XRP and 0.010578 BTC, seized on or about February 24, 2021, from Coinbase account ending in F441, held in the name Joao Mendes, including, but not limited to:

     i.     4.33225635 BTC;
     ii.    18.0000 BTC;
    iii.   12.0000 BTC;
    iv.   1,967.9000 ATOM;
     v.    30.99229603 MKR;
    vi.   29,444.2528975 XLM;
   vii.   3,854.220 LINK;

       viii.    14791.9930 OMG;
        ix.    5962.001596 XTZ;
         x.    39128.0000 OXT;
        xi.    82.82694077 COMP;
       xii.    27080.891495 ALGO;
      xiii.    4,104.58261364 UNI;
      xiv.    7,072.87517 ZRX;
       xv.    3.6417 EOS;
      xvi.    0.00000064 YFI;
     xvii.    4.27842985 NU;
    xviii.    2.08085345 CGLD;
     xix.    1.40446132 GRT; and
      xx.    10.0000 BAND;

22) Funds surrendered from Lafayette Life Insurance Company on April 9, 2021 pursuant to a Seizure Warrant, specifically:

        i.    $7,991.54 - policy #A 1030942
      ii.    $10,248.83 - policy #A 1043019

23) Any and all funds held in any Gemini account in the name Evamarie Joubert including, but not limited to:
        i.    4 ETH.

24) Any and all funds held in any Bybit account in the name Joao Mendes, including, but not limited to:
        i.    35 BTC

25) Any and all funds representing proceeds of the subject loans held in any Hotbit account in the name Joao Mendes,

26) Any and all funds representing proceeds of the subject loans held in any Kucoin account in the name Joao Mendes, and

27) Any and all funds held in any Phemex account in the name Joao Mendes.

75.    If any of the property described in Paragraph 74, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

      a.   cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 74 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Mackenzie A. Queenin*
Mackenzie A. Queenin
Carol E. Head
Assistant U.S. Attorneys

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION

By:    */s/ Jennifer L. Bilinkas*
Jennifer L. Bilinkas
Trial Attorney, Fraud Section
U.S. Department of Justice

Date: July 21, 2022

21